IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEMETRIC FAVORS,

    Plaintiff,

              v.

CITY OF ATLANTA,
a municipal corporation of the State of
Georgia,

    Defendant.

Civil Action No.
1:17-cv-03996-SDG

## OPINION AND ORDER

This matter is before the Court on Defendant City of Atlanta's (the "City") motion for summary judgment [ECF 105]; Plaintiff Demetric Favors's motion for partial summary judgment [ECF 110]; and the City's notice of objection and request for attorneys' fees [ECF 120]. Based on a careful review of the record, and with the benefit of oral argument, the City's motion for summary judgment is **GRANTED**; Favors's motion for partial summary judgment is **GRANTED**; and the City's notice of objection and request for attorneys' fees is **DENIED**.

## I.    BACKGROUND

Unless otherwise noted, the following facts are not disputed by the parties or are supported by undisputed evidence in the record. On October 10, 2015, Favors visited Magic City—an adult entertainment club in Atlanta, Georgia—with

a group of other individuals.[1] After entering Magic City, Favors remained at the bar near the entrance with other individuals in the group.[2] Soon after, a different male patron—who was later identified as Desmond Brown—grabbed a stack of money from Magic City's stage while the dancers performed.[3] About the same time, Favors and the other individuals with whom he arrived exited Magic City.[4] As Favors walked through Magic City's parking lot, Brown returned to the stage, grabbed another stack of bills from a Styrofoam plate, and exited the club.[5]

Prior to these events, then-Atlanta Police Department ("APD") Officer Emmanuel Thompson had driven to and parked his squad car in a parking lot adjacent to Magic City to show a police presence and generally patrol for crime prevention.[6] While parked, Magic City's head of security—LiTiesa Alford—alerted Thompson that a male patron wearing a red bandana had taken another patron's money and ran out of the club.[7] Thompson exited his car and began

---

[1]   ECF 118, ¶¶ 1–2.

[2]   *Id.* ¶ 4.

[3]   *Id.* ¶¶ 5–6.

[4]   *Id.* ¶ 7.

[5]   *Id.* ¶¶ 8–9.

[6]   *Id.* ¶¶ 10, 12.

[7]   *Id.* ¶ 13.

assisting Alford and Magic City's on-duty security officer in searching for this male individual (*i.e.*, Brown).[8]

About this time, Magic City's security officer saw a male individual—whom he believed matched the description of the person who had taken the money—enter a white Chevrolet Traverse in the Magic City parking lot.[9] Favors sat in the front passenger seat—and Brown in the backseat—of that Traverse.[10] The driver of the Traverse was later identified as Dexter Binns.[11] As the Traverse attempted to leave the parking lot, the security officer ran alongside it in an attempt to stop it.[12] The Traverse did not stop, and as it exited the parking lot, Thompson discharged his firearm five times into the vehicle.[13] Two rounds entered the Traverse's front passenger door, striking Favors in the right thigh and ankle.[14] The remaining three rounds struck the Traverse's rear bumper and lift gate door.[15] The

---

[8]   *Id.* ¶¶ 15–16.

[9]   ECF 115, ¶ 4.

[10]   ECF 118, ¶ 17.

[11]   *Id.* ¶ 19.

[12]   *Id.* ¶ 20.

[13]   *Id.* ¶ 22.

[14]   ECF 115, ¶ 7.

[15]   *Id.*

Traverse exited the parking lot at a high rate of speed and crashed into another vehicle.[16] After the crash, Binns and Brown fled on foot while Favors remained at the crash site.[17] Thompson subsequently arrested Favors.[18] Favors was then transported to the hospital for treatment.[19]

On March 23, 2016, the APD Office of Professional Standards ("OPS") concluded its investigation into the shooting at Magic City.[20] OPS found video surveillance of the incident contradicted Thompson's rationale for firing at the Traverse.[21] OPS also found that "there [was] no evidence to support any articulable threat of violence towards [Thompson], [or] anyone present."[22] Specifically, OPS found no articulable threat that "the driver's escape would create a continuing danger of serious physical harm to any person."[23] Given these

---

[16] *Id.* ¶ 24.

[17] *Id.* ¶¶ 25–26.

[18] ECF 115, ¶ 12.

[19] *Id.* ¶ 28.

[20] *Id.* ¶ 60.

[21] *Id.* ¶ 62.

[22] *Id.* ¶ 63.

[23] *Id.* ¶ 64.

findings, OPS concluded that Thompson lacked justification for shooting at the Traverse and recommended that he be fired.[24]

On March 25, 2016, Thompson resigned from the APD.[25] As a result of Thompson's resignation, OPS closed its investigation.[26] Later, a grand jury indicted Thompson on counts of aggravated assault, violation of oath by a police officer, and making false statements.[27] Thompson was eventually charged with simple assault.[28] On March 6, 2019, Thompson pleaded guilty to the simple assault charge and received a sentence as a first offender that included 12 months of probation and the revocation of his Peace Officers Standards and Training Counsel ("P.O.S.T.") certification.[29]

Favors initiated this case on October 10, 2017, asserting two causes of action solely against the City.[30] In Count I, Favors asserts a claim under 28 U.S.C. § 1983.[31]

---

[24]   *Id.* ¶ 65.

[25]   *Id.* ¶ 67.

[26]   *Id.* ¶ 69.

[27]   ECF 115, ¶ 18.

[28]   *Id.* ¶ 19.

[29]   *Id.* ¶ 20.

[30]   ECF 1.

[31]   *Id.*

In Count II, Favors seeks an award of attorneys' fees under 28 U.S.C. § 1988.[32] On September 11, 2019, the City filed its motion for summary judgment as to both claims asserted by Favors.[33] On the same day, Favors filed his motion for partial summary judgment only on the issue of whether his constitutional rights were violated.[34] On October 2, 2019, both parties filed responses in opposition to the cross-motions for summary judgment.[35] The City also filed its notice of objection and request for attorneys' fees that day.[36] On October 16, 2019, both parties filed their respective replies to the cross-motions for summary judgment,[37] and Favors filed a response in opposition to the City's objection and request for attorneys' fees.[38] With leave of Court, the City filed its surreply in opposition to Favors' motion for partial summary judgment on November 14, 2019.[39] The Court heard oral argument on the cross-motions on March 10, 2020.[40]

---

[32]   *Id.*

[33]   ECF 105.

[34]   ECF 110.

[35]   ECF 114; ECF 117.

[36]   ECF 120.

[37]   ECF 124; ECF 125.

[38]   ECF 126.

[39]   ECF 132.

[40]   ECF 136.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" are not material. *Id*. A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324. The non-movant "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. If the evidence relied on by the non-movant is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Id.* at 255. *See also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and cannot be made by the district court. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also Anderson*, 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

## III.   DISCUSSION

### a.   The City's Notice of Objection and Request for Attorneys' Fees

The City requests that the Court exclude eleven exhibits attached to, and relied on by, Favors's motion for partial summary judgment—and award the City

its attorneys' fees as a sanction—because Favors failed to timely produce these

exhibits during the fact discovery period. The City specifically objects to exhibits

23, 25, 26, 29, 31, 34, 36, 38, 40, 42, and 44—all of which are APD police reports.

Favors, conversely, contends the Court should not exclude these exhibits, or award

the City attorneys' fees, because he disclosed these documents in a reasonable

manner under the circumstances.

Federal Rule of Civil Procedure 37(c)(1) states:

> If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
>> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure . . . .

It is explicit in Rule 37 that "[e]xclusion . . . is not mandatory." *In re Delta/AirTran*

*Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1358 (N.D. Ga. 2012) (citing

*Bearint v. Dorell Juvenile Grp., Inc. (Ex rel. Bearint)*, 389 F.3d 1339, 1348 (11th Cir.

2004)). Instead, the Court possesses "broad discretion in determining whether a

violation is justified or harmless." *Abdulla v. Klosinski*, 898 F. Supp. 2d 1348, 1359

(S.D. Ga. 2012) (citing *Catalina Rental Apts., Inc. v. Pacific Ins. Co.*, No. 06–20532–

CIV, 2007 WL 1050634, at *2 (S.D. Fla. Apr. 03, 2007)).

Under the first prong, "an individual's discovery conduct should be found 'substantially justified' under Rule 37 if it is a response to a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *Devaney v. Cont'l Am. Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993). For the second prong, "[a] discovery mistake is harmless if it is honest, and is coupled with the other party having sufficient knowledge that the material has not been produced." *Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 300 F. Supp. 2d 1297, 1308 (N.D. Ga. 2003). Courts generally consider the following factors in this analysis:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Abdulla*, 898 F. Supp. 2d at 1359 (citing *Two Men and a Truck Int'l, Inc. v. Res. & Commercial Trans. Co.*, No. 4:08–cv–067, 2008 WL 5235115, at *2 (N.D. Fla. Oct. 20, 2008)).

Pursuant to the Court's order, the fact discovery period in this case closed on March 7, 2019.[41] It is undisputed that Favors provided the at-issue exhibits to the City on May 20, 2019—over two months after the fact discovery period had

---

[41]   ECF 69.

closed.[42] The City argues this delay caused it prejudice because the documents were produced only one day before the scheduled deposition of Favors's expert—Scott DeFoe—and Favors obtained the documents directly from the APD *ex parte* without the inclusion of the City's legal counsel.

Based on the record, Favors violated Rule 37(c) by producing the at-issue police reports to the City well after the close of the fact discovery period and one day prior to DeFoe's deposition. Courts routinely find this type of conduct prejudicial. *E.g., Pitts v. HP Pelzer Auto. Sys., Inc.*, 331 F.R.D. 688, 694 (S.D. Ga. 2019) ("The improper disclosure of requested documents after the close of discovery generally results in prejudice to the opposing party."); *Paul v. Aramark Healthcare Support Servs., LLC*, No. 1:15-cv-189-MHC, 2016 WL 7888045, at *4 (N.D. Ga. June 2, 2016) ("Prejudice generally occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question."); *Abdulla*, 898 F. Supp. 2d at 1359 ("It is harmful to deprive opposing counsel of an opportunity to prepare for the deposition of an expert.").

---

[42]   ECF 120-1.

However, the Court holds that the City's sought-after remedies (*i.e.*, exclusion and sanctions in the form of attorneys' fees) are not warranted in this case. Based on the record, Favors had substantial justification for his delayed disclosure. Favors contends, and the City does not dispute, that he only received the police reports from APD's Office of Central Records mere days before DeFoe's deposition.[43] Once DeFoe reviewed the reports and determined they were relevant to—but did not change—his opinion or report, Favors produced the documents to the City.[44] This disclosure occurred within the expert discovery period, which did not close until June 28, 2019.[45] The Court concludes that Favors took reasonable steps under the circumstances to disclose to the City documents that are highly relevant and important to Favors's municipal liability claim.

Moreover, the record indicates that Favors's actions, even if unjustified, were harmless. Any prejudice suffered by the City has been substantially cured. It is true that the City did not receive the police reports until one day before DeFoe's deposition. However, the City does not argue that it was unable to adequately

---

[43]   ECF 126, at 7 ("With respect to the timing of the production of the reports, [Favors] explained to the City that we had only recently received the reports.").

[44]   *Id*.

[45]   ECF 83.

prepare for DeFoe's deposition. And the City had the opportunity to thoroughly examine DeFoe about the police reports during his deposition. Further, the City received the police reports four months before the deadline to file summary judgment briefs. Given this posture, the Court finds that the City has not been substantially prejudiced by the untimely disclosure.[46]

Therefore, the City's notice of objection and motion for attorneys' fees is **DENIED**.

### b.   Favors's Municipal Liability Claim Against the City

Favors's sole claim against the City is for municipal liability pursuant to 42 U.S.C. § 1983. The City requests summary judgment in its favor on this claim. Favors, conversely, requests summary judgment only on the issue of whether the City violated his constitutional rights.

Section 1983 provides:

---

[46]   The City also contends it suffered prejudice because Favors obtained the police reports directly from the APD through the Georgia Open Records Act without the inclusion of the City's legal counsel. Favors disputes this contention, stating that he did not rely on this Georgia statute to obtain the police reports, which were instead received by his legal counsel as part of their larger-scale, ongoing investigation into the APD's use-of-force tactics. Regardless of the source of the documents, the Court finds the City has not articulated sufficient prejudice from Favors having obtained these documents to warrant exclusion or sanctions.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 itself creates no substantive rights. *Baker v. McCollan*, 443 U.S. 137, 140, 144 n.3 (1979). Rather, it provides a "method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Id*.

Municipalities—such as the City—are considered "persons" for the purposes of § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "To impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

### *i.* Favors Has Demonstrated a Violation of His Constitutional Rights.

Favors moves for partial summary judgment on the sole issue of whether his constitutional rights were violated when he was shot by Thompson on October 10, 2015. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

A person is "seized" within the meaning of the Fourth Amendment when a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). The Fourth Amendment's protection against unreasonable searches and seizures specifically embodies the right of an individual to be free from the use of excessive force in the course of an arrest. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989); *Mercado v. City of Orlando*, 407 F.3d 1152, 1156-57 (11th Cir. 2005).

In *Tennessee v. Garner*, the Supreme Court set forth the standard for defining the reasonable use of deadly force to seize a person:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be

> used if necessary to prevent escape, and if, where
> feasible, some warning has been given.

471 U.S. 1, 11–12 (1985). Critically, the Supreme Court clarified that:

> The use of deadly force to prevent the escape of all felony
> suspects, whatever the circumstances, is constitutionally
> unreasonable. Where the suspect poses no immediate
> threat to the officer and no threat to others, the harm
> resulting from failing to apprehend him does not justify
> the use of deadly force to do so. . . . A police officer may
> not seize an unarmed, nondangerous suspect by
> shooting him dead.

*Id.* at 11. At bottom, "to determine whether the amount of force used by a police

officer was proper, a court must ask whether a reasonable officer would believe

that this level of force is necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d

1188, 1197 (11th Cir. 2002). "Using deadly force in a situation that clearly would

not justify its use is unreasonable under the Fourth Amendment." *Mercado*, 407

F.3d at 1160.

The parties here do not disagree: Thompson's use of deadly force by

shooting at the Traverse in the Magic City parking lot was unreasonable.

Thompson lacked probable cause to believe that Favors—or anyone else in the

vehicle—posed a threat of physical harm to anyone. Based on the record, it is clear

that no reasonable officer in Thompson's position would have believed the resort

to deadly force was necessary under these circumstances. Thompson's conduct

clearly violated Favors's Fourth Amendment right to be free from unreasonable seizure. Indeed, during oral argument, the City conceded that Thompson violated Favors's Fourth Amendment rights by shooting him without justification. Therefore, Favors's partial motion for summary judgment is **GRANTED**.

### ii.     Whether the City Had a Custom or Policy that Constituted Deliberate Indifference to Favors's Constitutional Rights

Although Favors has shown a violation of his constitutional rights, that does not automatically establish liability as to the City. A local government cannot be subjected to *respondeat superior* liability; it "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. *See also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) ("[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor."). In *Monell* and its progeny, the "Supreme Court has placed strict limitations on municipal liability under section 1983." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). A municipality "may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

To succeed under *Monell*, a plaintiff must specifically "identify a municipal policy or custom that caused the plaintiff's injury." *Brown*, 520 U.S. at 403.

*See also Gold*, 151 F.3d at 1350 ("[A] municipality may be held liable for the actions of a police officer only when municipal official policy causes a constitutional violation. [Plaintiff] must identify a municipal policy or custom that caused his injury.") (quotation marks omitted) (citations omitted). A plaintiff may establish a municipality policy by identifying either: "(1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (citing *Monell*, 436 U.S. at 690–91; *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999)). To establish a county policy, the plaintiff must "show a persistent and wide-spread practice." *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). Random acts and isolated incidents are insufficient. *Id*. The plaintiff must also establish that the municipality's "deliberate conduct" made it the "moving force" behind the alleged constitutional injury. *Brown*, 520 U.S. at 404.

### 1.     Municipal Liability Premised on a Failure to Train

Favors does not point to an officially promulgated policy by the City to support his claim. Instead, he asserts the City is liable for its failure to adequately train Thompson—and other APD officers—on the use of deadly force with regard to the necessary justification for shooting into moving vehicles.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, a municipality's liability "for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. *See also City of Okla. City v. Tuttle*, 471 U.S. 808, 822 (1985) (stating policy of "inadequate training . . . that respondent seeks to rely upon is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

A city is not automatically liable under § 1983 even if it inadequately trained its employees and those employees violated a plaintiff's constitutional rights. *Gold*, 151 F.3d at 1350. A city is only liable if the failure to train constitutes a "city policy." *Id*. Since a city will rarely maintain an express written or oral policy permitting a constitutional violation of inadequately training its employees, "a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." *Id*. *See also Connick*, 563 U.S. at 61 ("[A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact."); *City of Canton, Ohio v.*

*Harris*, 489 U.S. 378, 388 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.").

To demonstrate "deliberate indifference," a plaintiff must present evidence "that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350–51 (collecting cases). Without notice of a need to train in a particular area, a municipality is not liable as a matter of law for any such failure. *Id*. *See also Floyd v. DeKalb Cty., Georgia*, No. 1:06-cv-2256-TCB, 2008 WL 11408593, at *5 (N.D. Ga. Sept. 12, 2008) ("[T]he Eleventh Circuit has repeatedly held that absent notice of a need to train in a particular area, as a matter of law a municipality cannot be civilly liable for any failure to train or supervise."). As the Eleventh Circuit has succinctly described the problem: "Establishing notice of a need to train or supervise is difficult." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, FL*, 637 F.3d 1178, 1189 (11th Cir. 2011) (hereafter, "*AFL-CIO*"). *See also Bradley v. Benton*, No. 1:18-cv-01518-CAP, 2018 WL 8949775, at *7 (N.D. Ga. Oct. 30, 2018) ("Municipal liability based on a failure to train is particularly difficult to establish.").

The Supreme Court has, however, made clear that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations that present an obvious potential for such a violation, could trigger municipal liability. *Canton*, 489 U.S. at 390. To illustrate this point, the Supreme Court provided the following hypothetical:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights. It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are deliberately indifferent to the need.

*Id.* at 390 n.10. *See also Jernigan v. City of Montgomery, Ala.*, 806 F. App'x 915, 919 (11th Cir. 2020) ("[A] plaintiff must prove that the violation of his or her federal rights was a highly predictable consequence of failing to train its officers."); *AFL-CIO*, 637 F.3d at 1189 ("In some cases, the need for training is so obvious that deliberate indifference can be established even without an earlier violation or pattern of abuse.").

Favors argues the City had notice of the need to train its officers on the use of deadly force in relation to the proper justification for shooting into moving vehicles to stop fleeing felons. He points to evidence showing APD officers frequently face this precise dilemma. For example, out of the 542 use-of-force incidents reported by the APD in 2013, 15 involved the use of a firearm.[47] Two of those 15 reported incidents involved APD officers shooting into a vehicle.[48] Favors contends an additional incident of an APD officer firing into a moving vehicle occurred in October 2013, but was not reported.[49] In 2014, out of the 608 total use-of-force incidents reported by APD, 16 involve the use of firearms.[50] Two of those had APD officers shooting into vehicles.[51] In 2015, out of the 618 total incidents, 15 involved firearms, of which six involved APD officers shooting into vehicles.[52] Some, but not all, of these incidents were determined by the APD to be departmental policy violations.[53]

---

[47]   ECF 110-23. The remaining use-of-force reports concerned an officer's use of physical force, pepper spray, batons, or tasers.

[48]   ECF 115, ¶ 46; ECF 110-24; ECF 110-26.

[49]   ECF 115, ¶ 47.

[50]   *Id*. ¶ 48; ECF 110-29.

[51]   ECF 110-30; ECF 110-32.

[52]   ECF 115, ¶¶ 50–51.

[53]   Additionally, not all of these reports indicate whether the APD officers shot

Based on this evidence, the Court finds that the City was on notice of the need to train its officers about the proper justifications for the use of deadly force and of using such force by shooting into vehicles to stop fleeing felons. Beyond an isolated incident or random occurrence, Favors presents evidence showing a regular series of incidents involving firearms and vehicles. This is the precise type of scenario envisioned by the Supreme Court in *Canton*; the City should know to a "moral certainty" that its officers will be required to deal with suspects attempting to flee in vehicles and need to know when the use of deadly force is appropriate. In fact, Officer Patrick Fite—the City's Rule 30(b)(6) representative — testified that the City maintains an official policy expressly permitting its officers to fire into moving vehicles in certain circumstances.[54] As such, the City was on notice of the need to train its officers—including Thompson—on this precise type of situation.

Notice alone, however, is insufficient to establish deliberate indifference. Favors must go further and demonstrate that the City "made a deliberate choice not to train its employees." *AFL-CIO*, 637 F.3d at 1189. *See also Gold*, 151 F.3d at 1350. And it is here that Favors's municipal liability claim falls short.

---

into a moving or parked vehicle.

[54]   ECF 105-16 (Fite Dep. Tr. 153:15–155:19).

The City points to substantial uncontroverted evidence demonstrating the level of training it provides to its officers. For example, the P.O.S.T. for the State of Georgia "sets the standards for training and certification for all Georgia officers."[55] The Georgia P.O.S.T. standard for basic law enforcement training in a police academy is 408 hours.[56] APD requires 401 more hours of basic training in its academy than required by the P.O.S.T.[57] Fite testified that 56 hours of a new officer's basic training focuses exclusively on firearms training, both actual shooting and classroom learning that involves instruction on APD's Standard Operating Procedures ("SOP") on the use of a firearm and use of force.[58] All the basic training courses are taught by APD officers who are P.O.S.T.-certified instructors.[59]

After basic training, and pursuant to APD SOP 2084, APD officers are required to maintain annual training and complete the recertification process, as mandated by the Georgia P.O.S.T.[60] To satisfy the Georgia P.O.S.T. recertification

---

[55]   ECF 105, ¶ 29.

[56]   ECF 105-27, ¶ 33.

[57]   *Id*. ¶ 34.

[58]   ECF 105-16 (Fite Dep. Tr. 24:2–26:4).

[59]   ECF 118, ¶ 35.

[60]   *Id*. ¶ 30.

requirements, APD officers must annually complete 20 hours of training, which must include firearms requalification and instruction on the use of deadly force.[61] Of the 20 hours of annual continuing-education training that P.O.S.T. mandates, only one hour of deadly force training is required.[62]

The APD also maintains a specific SOP in its use of force policy regarding the proper justification for the use of deadly force:

> An employee may use deadly force to apprehend a suspected felon only when:
>
> 1.     He or she reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury and when he or she reasonably believes that the suspect poses an immediate threat of serious bodily injury to the officer or others; or
>
> 2.     When there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm (O.C.G.A. Section 17-4-20) and the employee reasonably believes that the suspect's escape would create a continuing danger of serious physical harm to any person.[63]

---

[61]   *Id.* ¶ 31.

[62]   *Id.* ¶ 57.

[63]   ECF 105-25.

This policy is intended to mirror both Georgia and federal law regarding the appropriate use of deadly force.

Favors argues a genuine issue of material fact exists as to whether, notwithstanding the above, the City adequately trained its officers on the use of deadly force relating to the proper justification for firing into a moving vehicle. In support, Favors relies on (1) Thompson's deposition testimony in this case, and (2) DeFoe's expert report.

First, Favors's reliance on Thompson's sworn statements is insufficient to create a genuine issue of material fact. Thompson testified that he believed he "needed more training," and the situation in Magic City's parking lot was "[s]omething I don't believe I was quite prepared for."[64] Thompson reiterated that he did not receive enough training—and could have received more training—on specific scenarios "dealing with vehicles and shooting, no shooting. Getting more in depth on reporting felons because you are making a decision based on what others give you."[65] Thompson further testified that he could not remember receiving a copy of APD's use-of-force policy at the police academy, but he was

---

[64]   ECF 119-17 (Thompson Dep. Tr. 177:3–13).

[65]   *Id.* (Thompson Dep. Tr. 177:21–178:9).

aware of certain provisions in the policy related to the use of firearms at the time he shot Favors.[66]

Thompson's subjective feelings as to the adequacy of his training cannot, as a matter of law, make the City liable for his actions. Viewing the evidence in a light most favorable to Favors, Thompson's testimony does not change uncontroverted law: "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." *Canton*, 489 U.S. at 390–91. *See also Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) ("[E]vidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy."); *Marable v. W. Pottsgrove Twp.*, 176 F. App'x 275, 283 (3d Cir. 2006) ("[A] mere showing that a particular officer violated policy, or that better training would have enabled the officer to avoid the injury-causing conduct, is insufficient to establish a municipality's liability under § 1983 for failure to train."); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998) ("Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training."); *Campbell v. City of Philadelphia*, 927 F. Supp. 2d 148, 174 (E.D. Pa. 2013) ("[A] police officer's non-

---

[66]   ECF 119-17 (Thompson Dep. Tr. 135:13–136:18).

compliance with training is an individual fault and does not demonstrate the requisite deliberate indifference needed to sustain a claim of municipal liability for failure to train.").

Put another way, while Thompson might subjectively believe more training would have better prepared him for the specific choice he faced in the Magic City parking lot (*i.e.*, Thompson speculates he may not have shot Favors if the City had provided him with more training), this does not create a triable issue of fact in this case against the City. The Supreme Court has rejected this precise theory: "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Canton*, 489 U.S. at 391. In sum, to hold the City liable for Thompson's criminal conduct based on his own subjective belief that he received an inadequate amount of training would make the City liable under a theory of *respondeat superior*—a result explicitly rejected in *Monell*. *Id.* (citing *Monell*, 436 U.S. at 693–94).

In any event, Thompson's self-serving characterizations of his training are contradicted by the undisputed facts in the record. In 2013, Thompson completed the APD's police academy, receiving 401 more hours of training than required by

the Georgia P.O.S.T.[67] Two weeks of Thompson's training at the police academy focused exclusively on the use of force and firearms.[68] Critically, Thompson—along with all other APD officers—received training on the specific issue of the judgmental use of force involving moving vehicles while at the police academy.[69] After the academy, Thompson received a total of 112 hours of training in 2014.[70] Although only required to complete one hour to satisfy the Georgia P.O.S.T., Thompson received eight hours of firearms requalification and training on the appropriate use of deadly force.[71] In 2015, prior to the shooting, Thompson received 131 more hours of total training.[72] During his deposition, Thompson agreed that the City provided him with more training than is required by Georgia law.[73] Thus, based on the uncontroverted facts above, Thompson's training met, or exceeded, the requirements set by the Georgia P.O.S.T.

---

[67]   ECF 105-27, ¶ 51.

[68]   *Id*. ¶ 52.

[69]   ECF 105-20; ECF 119-17 (Thompson Dep. Tr. 133:24–134:16).

[70]   ECF 105-15.

[71]   *Id*.

[72]   *Id*.

[73]   Thompson Dep. Tr. 156:17–157:14.

Finally, simply because Thompson cannot affirmatively remember receiving a physical copy of the APD use-of-force policy is not dispositive and does not create a genuine issue of material fact. The record demonstrates that Thompson received training on the policy while at the police academy. For example, Fite testified that he specifically provided Thompson with training according to the policy on the use of firearms.[74] Fite testified that this training involved 56 hours of firearm instruction and included a review of the APD's use-of-force policy.[75] Thompson admitted to having received training on the use-of-force policy when he attended the APD academy in 2013.[76] The fact that Thompson cannot *post hac* remember receiving a physical copy of the policy does not negate the evidence of his training or create a genuine issue of material fact.[77]

Second, Favors's reliance on DeFoe's expert report is likewise unavailing. DeFoe opines that Thompson's actions on October 10, 2015 were unreasonable for a host of reasons and the APD insufficiently trained Thompson. For example, DeFoe states that Thompson's training was inadequate because (1) APD failed to

---

[74]   ECF 119-14 (Fite Dep. Tr. 23:18–24:3).

[75]   *Id.* at 24:8–25:20.

[76]   ECF 119-17 (Thompson Dep. Tr. 132:6–9).

[77]   The City did not present documentary evidence demonstrating that Thompson received a physical copy of the policy.

provide Thompson any less-than-deadly-force training for a period of 22 months (December 14, 2013 through October 10, 2015); (2) APD failed to provide Thompson the required annual in-service training on firearms requalification and the use of deadly force; and (3) Thompson did not receive any firearms retraining or training on the use of deadly force from November 10, 2014 through October 10, 2015.[78]

As stated above, DeFoe's opinions as to the adequacy of Thompson's training are insufficient to establish municipal liability or create a triable issue of fact. *Canton*, 489 U.S. at 390–91. Even if that were not the case, DeFoe's assertions are contradicted by the undisputed record. For example, for the 22-month time period identified by DeFoe—December 14, 2013 through October 10, 2015— Thompson completed 1,052 hours of total training.[79] Some of these hours included training on de-escalation tactics, which are separate from the use of deadly force.[80] Moreover, in May 2015, Thompson received his annual in-service training.[81] While DeFoe may believe Thompson should have been provided more training, which

---

[78]   ECF 125, at 7–8.

[79]   ECF 105-15.

[80]   *Id*.

[81]   *Id*.

can certainly be debated, it is undisputed that Thompson's training exceeded the amount required by Georgia law. Finally, while DeFoe is correct that Thompson did not receive a firearms or use-of-force requalification from November 2014 through October 2015, the undisputed evidence shows he completed both trainings in December 2015.[82] Since Georgia law only requires an officer to complete the requalification once each calendar year, Thompson complied with the training requirement in this regard. At bottom, DeFoe's opinions regarding the adequacy of Thompson's training do not establish municipal liability for the City.

DeFoe additionally asserts that the City does "not have adequate policies and procedures in place for when it would be appropriate for officers to shoot into moving vehicles."[83] DeFoe's general and conclusory criticism does not pass muster. Contrary to DeFoe's opinions, the City does appear to understand the need for a policy addressing the use of deadly force with respect to moving vehicles. As such, the City has promulgated APD SOP 3050. Section 4.17.3 of that SOP specifically prohibits an officer from "[d]ischarging a firearm in an effort to stop a fleeing vehicle."[84] This section, however, "does not prohibit a police officer

---

[82]   ECF 105-15.

[83]   ECF 117-11.

[84]   ECF 119-16.

from using his or her firearm as a lethal force option when it is reasonable and necessary."[85] Given this discretion, the City provides its officers with training on this SOP.[86] And the City provided its officers—including Thompson—with training on the judgmental use of deadly force in relation to moving vehicles while at the police academy.[87] This evidence indicates that, rather than turning a blind eye to the problem, the City *had* a policy prohibiting the precise type of conduct Thompson unfortunately exhibited on October 10, 2015. This undermines any argument that the City acted with the requisite deliberate indifference necessary to establish municipal liability. *Valle v. City of Houston*, 613 F.3d 536, 548 (5th Cir. 2010) ("[I]t is difficult to show deliberate indifference in a case such as this one where the City has implemented at least some training. The very fact that the City trained a corps of officers in CIT tactics, demonstrates that it was not deliberately indifferent to the dangers of police interactions with mentally ill residents."). That Thompson acted contrary to his training does not make the City liable for his actions.

---

[85]   *Id.*

[86]   ECF 119-14 (Fite Dep. Tr. 163:4–15).

[87]   ECF 105-20; ECF 119-17 (Thompson Dep. Tr. 133:24–134:16).

In sum, while Favors argues that the City could have done more to train Thompson and other APD officers on the use of deadly force in relation to moving vehicles, Favors does not meet his burden of presenting evidence creating a genuine issue of material fact on whether the City acted with deliberate indifference. *Canton*, 489 U.S. at 391 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").

### 2.    Municipal Liability Premised on a Failure to Supervise.

Favors additionally asserts the City is liable under *Monell* for failing to adequately supervise its officers. He packages together an assortment of events he claims demonstrates deliberate indifference by the City. For example, Favors claims the City is liable because (1) Thompson failed to properly report his shooting of Favors; (2) the City failed to properly evaluate and investigate the incident; and (3) the City routinely failed to document and evaluate use-of-force incidents involving moving vehicles.

First, Favors's assertion that Thompson failed to properly report the October 10, 2015 shooting is misplaced in the municipal liability analysis. In essence, Favors seeks to hold the City liable for Thompson's personal failure to correctly

report the shooting. This falls squarely under a theory of *respondeat superior*. Assuming the truth of Favors's allegations, they fail as a matter of law; the Supreme Court has explicitly rejected municipal liability in this context. *Monell*, 436 U.S. at 693–94. *See also Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th Cir. 2007) ("[I]t is by now axiomatic that in order to be held liable for a § 1983 violation, a municipality must be found to have *itself* caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory."). Nonetheless, Favors's contentions are directly contradicted by the record, which indicates that Thompson submitted an incident report and statement concerning the events.[88]

Second, Favors's argument regarding the adequacy of the City's evaluation and investigation is likewise unavailing. Favors contends that the City did not follow the use-of-force "Reporting Requirements" or "Chain of Command Review" procedures after the shooting.[89] However, he fails to articulate how these alleged failures, even if true, violated his constitutional rights or constituted deliberate indifference by the City. To the contrary, the City presents evidence that it investigated the shooting.[90] This investigation subsequently led to a finding that

---

[88]   ECF 110-4; ECF 119-17 (Thompson Dep. Tr. 138:19–139:12).

[89]   ECF 110-2, at 20–21.

[90]   ECF 114, at 12–13.

Thompson acted without proper justification, a recommendation that he be terminated from the APD, criminal charges, and ultimately a criminal conviction of Thompson. This sequence belies any assertion that the City violated Favors's constitutional rights or acted with deliberate indifference concerning the need to investigate. *See Schwartz v. Gwinnett Cty., Ga.*, 924 F. Supp. 2d 1362, 1374 (N.D. Ga. 2013) ("A municipality may be held liable under Section 1983 when its policy or custom of inadequately training or supervising its officers causes a constitutional injury.") (citing *AFL-CIO*, 637 F.3d at 1188).

Finally, Favors claims the City has "systemically failed to provide complete reporting, chain of command review, and use of force review and analysis of officer involved shootings into moving vehicles."[91] Pursuant to APD SOP 2020, a "[c]omplaint against any Police Department employee will be accepted from any source at the [OPS] or by any supervisor at any facility in the Department regardless of the location of the alleged occurrence."[92] In 2015, complaints involving the serious injury or death of a person allegedly resulting from an action by an officer were investigated by the APD's Homicide Unit.[93] The Homicide Unit

---

[91]  ECF 125, at 12–13.

[92]  ECF 118, ¶ 36. This SOP became effective on May 29, 2015.

[93]  *Id*. ¶ 40.

was required to contact, interview, and obtain written statements from all complainants, witnesses, and other employees who were involved in the complaint, as well as locate documents relevant to the investigation.[94] At the conclusion of the investigation, the investigator was required to determine if each alleged work rule violation was supported by the facts and issue a disposition. The investigator could then recommend that the charges be sustained against the officer.[95]

Favors claims the City failed to properly supervise its officers by permitting these incidents to be referred to the Homicide Unit for investigation. Favors also claims many of the incident reports do not contain a review of the incident from the allegedly offending officer's direct supervisor or a sufficient amount of detailed information to determine if the shooting was justified. According to Favors, this confluence of facts has systematically prevented the City from adequately analyzing the APD to ensure no trends exist that would necessitate an increased amount of training for its officers. These assertions of widespread non-compliance with the APD's procedures, however, are insufficient to establish municipal liability.

---

[94]   *Id*. ¶¶ 41–42.

[95]   *Id*. ¶¶ 42–47.

As an initial matter, Favors has failed to show that the City's actions violated his constitutional rights. He instead speculates that the City's internal procedures, which he does not assert are facially unconstitutional, are suppressing incident reports concerning an officer's use of force in relation to a moving vehicle. But these alleged abuses are not tied to a deprivation of a constitutional right. Without a constitutional violation, Favors' municipal liability claim fails. *Hines v. Jefferson*, 338 F. Supp. 3d 1288, 1305 (N.D. Ga. 2018). Even assuming a constitutional violation, Favors's allegations do not establish that the City was aware of any need to provide greater supervision to its officers in this area. Favors points to no evidence demonstrating a "widespread pattern of prior abuse" or even a "single earlier constitutional violation." *AFL-CIO*, 637 F.3d at 1189. And, in contrast to the above situation of officers allegedly not being properly trained to deal with fleeing felons in moving vehicles, there is no indication that this is the type of scenario in which a need for increased supervision is so obvious that deliberate indifference can be demonstrated without an earlier violation or pattern of abuse.

Finally, even assuming a constitutional violation of which the City had notice, Favors "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. He has not met

this burden. He fails to present any evidence that the City made an intentional decision to not investigate officer complaints or to provide only limited factual material about such complaints for the purpose of hindering potential § 1983 plaintiffs. Instead, the record shows that the City has adopted policies and procedures mandating certain reporting requirements. This effectively undermines Favors's argument. *Valle*, 613 F.3d at 548.

**c.      Favors's Claim for Attorneys' Fees**

In Count II of the Complaint, Favors asserts a claim for attorneys' fees pursuant to 28 U.S.C. § 1988. "Section 1988 authorizes attorney's fees as part of a remedy for violations of civil rights statutes; it does not create an independent right of action." *Estes v. Tuscaloosa Cty., Ala.*, 696 F.2d 898, 901 (11th Cir. 1983). Since Favors cannot maintain his municipal liability claim under § 1983, his claim for attorneys' fees likewise fails.

**IV.     CONCLUSION**

The City's motion for summary judgment [ECF 105] is **GRANTED**; Favors'

motion for partial summary judgment [ECF 110] is **GRANTED**; and the City's

notice of objection and request for attorneys' fees [ECF 120] is **DENIED**. The Clerk

is **DIRECTED** to enter judgment in favor of the City on Favors's claims and close

the case.

**SO ORDERED** this the 23rd day of July 2020.

Steven D. Grimberg
United States District Court Judge